IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD KYLE,

        Plaintiff,

    v.

APOLLOMAX, LLC, O'NEILL, LLC
d/b/a O'NEILL INNOVATIONS, and
MICHAEL O'NEILL,

        Defendants.

Civil Action No. 12-152-RGA

APOLLOMAX, LLC and O'NEILL, LLC
d/b/a O'NEILL INNOVATIONS,

        Defendants/Counterclaim-
        Plaintiffs,

    v.

RONALD KYLE,

        Plaintiff/Counterclaim-
        Defendant,

    and

DOUGLAS PORCELLI,

        Counterclaim-Defendant/
        Counterclaim-Plaintiff.

## **MEMORANDUM OPINION**

Christopher Viceconte, Esq., GIBBONS PC, Wilmington, DE; John Q. Lewis, Esq., TUCKER
ELLIS LLP, Cleveland, OH; Seth J. Linnick, Esq., TUCKER ELLIS LLP, Cleveland, OH.

    Attorneys for Defendants/Counterclaim-Plaintiffs Apollomax, LLC, O'Neill, LLC d/b/a
O'Neill Innovations, and Michael O'Neill.

Seth J. Reidenberg, Esq., TYBOUT, REDFEARN & PELL, Wilmington, DE; Alan L. Frank, Esq., ALAN L. FRANK LAW ASSOCIATES, P.C., Jenkintown, PA; Susan B. Pliner, Esq., ALAN L. FRANK LAW ASSOCIATES, P.C., Jenkintown, PA.

Attorneys for Plaintiff/Counterclaim-Defendant Ronald Kyle and Counterclaim-Defendant/Counterclaim-Plaintiff Douglas Porcelli.

November _____, 2013

*Ruhard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Ronald Kyle ("Plaintiff" or "Kyle") initiated this action against Michael O'Neill ("Mr.

O'Neill), Apollomax, LLC, and O'Neill, LLC d/b/a O'Neill Innovations (collectively, the

"Defendants") on February 8, 2012. (D.I. 1). On November 14, 2012, Kyle filed an Amended

Complaint asserting four causes of action: breach of fiduciary duty, conversion, breach of the

Operating Agreement, and breach of the implied covenant of good faith and fair dealing.[1] (D.I.

104). The Defendants filed the instant motion for summary judgment on May 17, 2013. (D.I.

171). The motion is fully briefed. (D.I. 172, 190 & 202). For the reasons that follow, the Court

will grant the Defendants' motion for summary judgment as to Counts II and IV and will deny

the Defendants' motion for summary judgment as to Counts I and III.

## I. BACKGROUND

The basis for this dispute began in January 2010 when Mr. O'Neill arranged a meeting

between himself and Kyle to discuss the formation of a new business relationship. (D.I. 104, ¶

13). At that point, Mr. O'Neill was a member and CEO of Defendant O'Neill LLC, which was a

company engaged in the sale of Maxfit® gloves, among other products. (*Id.* ¶¶ 8, 16-19). Mr.

O'Neill was interested in acquiring Kyle's marketing services. Kyle was the president and

founder of Hi-Impact Marketing, a radio promotion firm. (*Id.* ¶¶ 10-13). Mr. O'Neill and Kyle

consequently joined forces to create a new Delaware company named Apollomax LLC

("Apollomax") on June 29, 2010. (*Id.* ¶ 23).

Mr. O'Neill and Kyle entered into a written Operating Agreement as part of Apollomax's

---

[1] Michelle O'Neill, Mr. O'Neill's wife, was named as a defendant in the Amended
Complaint, but she was later dismissed from the case. (D.I. 164).

formation. (D.I. 190-5). Pursuant to the Operating Agreement, Mr. O'Neill owned 85% of Apollomax's "LLC units"–defined as measures of ownership in Apollomax–and Kyle owned the remaining 15%. (*Id.* § 3.1). The Operating Agreement specifies that Mr. O'Neill would "as a member and manager of the company, guarantee a substantial portion of his time to the activities of the company to be consistent with his role in Research, Product Development, Operations and General Business & Venture Management–the day to day execution of business plans and growth of the company." (*Id.* at attachment 1, tbl.2). Similarly, the Operating Agreement provides that Kyle would "as a member and manager of the company, guarantee a substantial portion of his time to the activities of the company to be consistent with his role in Marketing, Sales and Financing–raising capital for the execution of business plans and growth of the company." (*Id.*).

Section 7.4 of the Operating Agreement sets forth two circumstances under which a member may be involuntarily removed from Apollomax. (*Id.* § 7.4). The situation relevant to the current cases arises if "the Member is required to provide services to the LLC (as reflected in attachment 1 of this agreement), said Member is not substantially performing the promised services, and a Supermajority in interest of LLC Members vote for removal."[2] (*Id.* § 7.4a(1)). Sixty days prior to a vote regarding any member's removal under this provision, however, "the other LLC Members shall cause a notice to be issued to the Member in question . . . detail[ing] specific instances or tasks that were allegedly not satisfactorily performed." (*Id.* § 7.4b). If, after the sixty day good faith opportunity to cure has elapsed, an affirmative "Supermajority vote in

---

[2] "Supermajority vote in interest of LLC members" is defined as "a vote of the LLC members in which each LLC member shall have one vote per LLC Unit possessed and the number of affirmative votes for any resolution before the members shall be more than 66% of the outstanding LLC Units." (D.I. 190-5 at art. I).

2

interest of LLC Members is made to remove the Member in question," then that person "shall no longer be entitled to exercise any rights, powers or privileges of a Member" and his LLC units are considered redeemed by Apollomax. (*Id.* § 7.4d). Because Mr. O'Neill owned 85% of Apollomax's LLC Units, he possessed the Supermajority vote required to remove Kyle under this procedure.

Apollomax got off to a promising start. In December 2010, Kyle assisted Apollomax in signing Big Time Products ("BTP") to a three year sales agreement that required BTP to purchase a minimum of 400,000 Maxfit® gloves per year from Apollomax. (D.I. 190-6 at 2). Throughout the duration of Kyle's membership with Apollomax, however, BTP was the only substantial client. At some later point, the principals of Apollomax and BTP–Mr. O'Neill, Kyle, Rick Chambers, and Harry Pierce–started discussing a plan to create a new joint venture. (D.I. 190-10). Although the time frame for the negotiations leading up to the subsequent formation of the new venture named Apollo Marketing LLC ("Apollo Marketing") is murky, two relevant aspects are clear. Kyle was not invited to be a member of Apollo Marketing, and BTP eventually began purchasing gloves from Apollo Marketing instead of Apollomax.

Kyle's relationship with Mr. O'Neill showed real signs of deterioration beginning on October 26, 2011 when Mr. O'Neill conducted a telephone meeting with Kyle to discuss Mr. O'Neill's belief that Kyle's performance to date had "been subject to a lack of deliverables." (D.I. 190-17 at 4). The alleged deficiencies in work product included a lack of marketing policies and procedures, corporate marketing or financial plans, and sales objectives. (*Id.*). On November 15, 2011, Mr. O'Neill sent Kyle a Notice of Failure to Perform Required Services (the "Notice"), stating that Kyle had not substantially performed the services required by

3

Apollomax's Operating Agreement. (D.I. 192). The Notice set forth "specific instances and tasks" that Kyle did not satisfactorily perform, including a failure: to sign or vet any sales representatives, and to create or execute a marketing or sales plan of action, marketing policies or procedures, a pricing plan, a marketing communications schedule, and an exhibition/show schedule. (*Id.*). The Notice established a cure period from November 15, 2011 until January 18, 2012–the scheduled date of the Vote for Removal. (*Id.*). The actions Kyle took and the extent to which he attempted to cure the deficiency during this period are heavily disputed by the parties. Mr. O'Neill held the Vote for Removal on January 18, 2012, and Kyle was voted out as a member of Apollomax. (D.I. 104, ¶ 43). This lawsuit followed.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Matsushita*, 475 U.S. at 587. The mere existence of some evidence in support of the nonmoving party,

4

however, will not be sufficient for denial of a motion for summary judgment. *Anderson*, 477 U.S. at 249. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Count I – Breach of Fiduciary Duty

Kyle asserts that Mr. O'Neill breached the fiduciary duties owed to him as a member of Apollomax. The crux of this claim is that Mr. O'Neill did not provide Kyle with an opportunity to participate in the formation of Apollo Marketing–a new venture that supplanted Apollomax as BTP's glove supplier. Kyle has presented enough evidence that a jury could reasonably find for him, and therefore the Defendants' motion for summary judgment with respect to Count I is denied.

Prior to delving into Delaware law on fiduciary duty, the Court pauses briefly to address the sufficiency of Kyle's Amended Complaint. The Amended Complaint states in vague terms that Mr. O'Neill's conduct "deprive[d] Kyle of the benefits of his participation in the operations of Apollomax LLC," and that Mr. O'Neill's actions were "breaches of the fiduciary duties owed to Kyle as a member and partner of Apollo[max] LLC." (D.I. 104, ¶¶ 51-52). In contrast, Kyle's Opposition Brief explains that his breach of fiduciary duty claim "stems from Defendants' negotiations to purchase BTP, subsequent formation of a new LLC (Apollo Marketing) and assignment or transfer of the assets of Apollomax to that new LLC without Plaintiff's

5

knowledge." (D.I. 190 at 12). The Defendants are correct that a party may not utilize its Opposition Brief as a vehicle for amending its claims, and if Kyle had not mentioned Apollo Marketing as support for his breach of fiduciary duty theory, the Defendants' motion for summary judgment would have to be granted. *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (noting that plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment" (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996))).

Here, the Amended Complaint does state that Mr. O'Neill "diverted Apollomax's assets and business opportunities to [his] own use and benefit to the detriment of Kyle." (D.I. 104, ¶ 45). Although not a model of clarity, this is sufficient to put the Defendants on notice that the transfer of Apollomax's assets and business opportunities to the newly formed Apollo Marketing could form the basis for Kyle's breach of fiduciary duty claim. Because Kyle is not amending the Amended Complaint through his brief, *Bell*'s holding does not compel this Court to dismiss Kyle's fiduciary duty claim. Thus, the analysis progresses to the application of Delaware's fiduciary duty laws to a Limited Liability Company.

Delaware's Limited Liability Company Act places a premium on the parties' freedom of contract, and the fiduciary duties of any person bound by an LLC agreement "may be expanded or restricted or eliminated by provisions in the limited liability company agreement." DEL. CODE ANN. tit. 6, § 18-1101(c) (West 2013), *amended by* H.B. 126, 147th Gen. Assemb., 1st Reg. Sess. (Del. 2013) (amending non-relevant provisions). Where the LLC agreement is silent with respect to fiduciary duties, Delaware law imposes default fiduciary duties on managers of an LLC. *Zimmerman v. Crothall*, 62 A.3d 676, 702 n.145 (Del. Ch. 2013) ("This Court recently

6

considered the issue of default fiduciary duties and held that, subject to clarification from the

Supreme Court, managers and managing members of an LLC do owe fiduciary duties as a default

matter."). The Apollomax Operating Agreement does not address fiduciary duties, so the default

fiduciary duties of care and loyalty apply. *See Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839,

856 (Del. Ch. 2012) (imposing traditional fiduciary duties of care and loyalty because LLC

Agreement at issue contained no provision displacing those duties).

The Defendants concede that the duty of loyalty applies, but contest whether the record

evidence supports a breach of that duty. According to the Defendants, discussions about the

formation of Apollo Marketing between Mr. O'Neill and BTP's proprietors did not commence

until after Mr. O'Neill began to take corrective action against Kyle for his deficient performance.

(D.I. 202 at 7). Essentially, the Defendants assert that Kyle precluded himself from any

opportunity in Apollo Marketing by failing to "meet his obligations under the Operating

Agreement." (*Id.*). While that may turn out to be the case, Kyle was still a member of

Apollomax during at least part of the discussions to form Apollo Marketing, and Kyle has put

forth evidence that Mr. O'Neill did not offer Kyle an opportunity to participate in the formation

of Apollo Marketing. (D.I. 190 at 14). The opportunity to form Apollo Marketing with the two

BTP executives was available to Mr. O'Neill because of his position as a member of Apollomax,

yet Kyle was not afforded that same opportunity. Interpreting the facts in the light most

favorable to Kyle, Mr. O'Neill's decision not to include Kyle could have denied him an

opportunity that he was owed, thereby resulting in a breach of the duty of loyalty. Thus, there is

sufficient evidence for a jury to reasonably find for Kyle on this issue, and the Defendants'

7

motion for summary judgment as to Count I is denied.[3]

## B. Count II – Conversion

Kyle's claim for conversion must fail. Long-standing Delaware precedent recognizes that "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, is a conversion." *Drug, Inc. v. Hunt*, 35 Del. 339, 354 (1933). If a plaintiff's conversion claim arises solely from a breach of contract, the general rule requires the plaintiff to sue in contract, not in tort. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009). In order for a conversion claim to accompany a contract claim in the same complaint, "the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract." *Id.* Moreover, subject to one narrow exception, a conversion claim seeking the payment of money cannot be sustained. *Goodrich v. E.F. Hutton Grp.*, 542 A.2d 1200, 1203 (Del. Ch. 1988) ("Money is subject to conversion *only* when it can be described or identified as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally." (emphasis added)).

In Kyle's Amended Complaint, he bases his conversion count on the fact that the Defendants "illegally froze Kyle out of the business operations of Apollomax," that the Defendants "illegally converted Kyle's ownership interest in Apollomax LLC to their own personal use and benefit," that the Defendants omitted Kyle from Apollomax's operations, and that the Defendants failed to pay Kyle for his ownership interest. (D.I. 104, ¶¶ 58-63). These issues are covered by the Operating Agreement, and thus Kyle has not alleged the violation of

---

[3] The parties are to submit simultaneous letters with authorities no later than November 15, 2013, addressing whether there is a right to a jury trial on this Count.

8

"an independent legal duty, apart from the duty imposed by contract." *Kuroda*, 971 A.2d at 889. Section 3.5 of the Operating Agreement controls the actions that can be taken by members of Apollomax, and Section 7.4 dictates the procedures for removing a member, including what compensation must be paid and when. (D.I. 190-5 §§ 3.5, 7.4). This renders Kyle's conversion claim duplicative of his breach of contract claim, and it cannot be sustained as alleged in the Amended Complaint.

Perhaps recognizing the Amended Complaint's shortcomings, Kyle revamped his conversion claim in the Opposition Brief, stating that, "Plaintiff's claim for conversion derives from Defendants' bad faith and breach of loyalty in forming a new LLC and assigning all of Apollomax's interests to that LLC without providing Plaintiff any membership interest in the same." (D.I. 190 at 19). This new framework, however, must also fail. Kyle's support for his position is conclusory and limited to a single sentence, which provides, "[t]he evidence shows Defendant converted Plaintiff's membership interest in Apollomax as well as Apollomax's assets to Apollo Marketing LLC." (*Id.*). Kyle has not pointed to any provision in the Operating Agreement that prohibited Mr. O'Neill from forming a new LLC, let alone a provision granting Kyle an ownership interest in any subsequently formed LLC by virtue of his role as a member of Apollomax.[4] In addition, the sales agreement between BTP and Apollo Marketing for glove sales was not consummated until February 2012, a month after Kyle was removed from Apollomax. (D.I. 190-15). Because the transfer of Apollomax's interests to Apollo Marketing occurred after Kyle's interest in Apollomax had been terminated, he had no interest in

---

[4] It is worth noting that Kyle does not supply a single citation to the record in support of the modified conversion theory he asserts in his Opposition Brief.

Apollomax that could have been converted by the transfer.

Moreover, Kyle seeks money damages as a remedy for the asserted conversion of his membership interest in Apollomax. (D.I. 104, ¶¶ 67-68). The rule, however, is that "[m]oney is subject to conversion only when it can be described or identified as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally." *Goodrich*, 542 A.2d at 1203. As shown by his Amended Complaint, Kyle's conversion claim could be satisfied by a general monetary payment, and thus cannot be enforced. Therefore, the Court will grant the Defendants' motion for summary judgment with respect to Count II.

### C. Count III – Breach of the Operating Agreement

Kyle's claim for breach of the Operating Agreement must survive the motion for summary judgment. The parties vigorously dispute what actions Kyle performed and when he performed them relative to the Notice and his eventual termination from Apollomax. These are questions of fact that must be determined at trial, and therefore summary judgment is inappropriate.

Section 7.4a details the required process to remove a member of Apollomax involuntarily on the grounds that the member "is not *substantially performing* the promised services." (D.I. 190-5, § 7.4a(1) (emphasis added)). The Operating Agreement also requires a sixty day "good faith opportunity to cure" the deficiencies prior to removal. (*Id.* § 7.4b). Kyle supplied evidence showing that his services contributed to the signing of BTP (D.I. 190-17 at 4), that he received capital commitments from several private lenders that were rejected by Mr. O'Neill (D.I. 190-9 at 22-23), that he conducted meetings with potential business partners, such as QVC and Under Armour, up through December 2011 (D.I. 190-9 at 6-7, 16), and that he completed at least an

10

initial business plan for Apollomax. (D.I. 190-9 at 24). Some of these efforts came after Mr. O'Neill put Kyle on notice of his unsatisfactory performance. Therefore, Kyle claims that the actions he took prove he was "substantially performing" under the Operating Agreement and that he cured his performance deficiencies. According to Kyle, this is the case even though he failed to accomplish several of the other deliverables that were required of him.

The Defendants counter that Kyle did not substantially perform because Kyle did not complete six tasks that he promised to deliver in April 2011,[5] nor did he address the ten areas of deficiency laid out in the November 2011 Notice.[6] For example, the Defendants argue, and Kyle agrees, that two of his "primary job responsibilities were to build and expand Apollomax's sales and to secure additional capital for the company." (D.I. 172 at 7). But Kyle helped expand Apollomax's sales by assisting with the BTP account, and, for reasons that are unclear, Mr. O'Neill rejected several of the capital financing offers that Kyle brought forward. (D.I. 190-4 at 10; D.I. 190-9 at 22-23). If expanding sales and securing capital investments were Kyle's "primary job responsibilities," it is possible that a jury could determine that landing one substantial client, such as BTP, and bringing multiple financing offers to Mr. O'Neill would satisfy the Operating Agreement's substantial performance requirement such that Mr. O'Neill

---

[5] This list includes the establishment of Carribean Distribution or ISO business, signing Michael Ross and Dan Ross as ISOs or distributors, signing Tom Quaile as a show manager and ISO, creating a financial plan and a show schedule for the summer and fall seasons, completing a full schedule of press releases to raise product awareness, and signing sales accounts with Wawa and Costco. (D.I. 190-17 at 4).

[6] The specific instances of unsatisfactory performance include failing to: sign or vet any sales representatives, sign or vet any distributors, secure additional customers, create a marketing or sales plan, create marketing policies or procedures, create any "Company marketing collateral," create a pricing plan, create a market segmentation plan, formulate a marketing communications schedule, and complete a financial model for exhibitions and shows. (D.I. 192).

11

was not justified in removing Kyle based on his performance under Section 7.4 of the Operating

Agreement.

In sum, it is not the case that Kyle did nothing that was asked of him, nor is it the case

that Kyle accomplished all of the tasks assigned to him. Kyle's performance falls somewhere in

the middle of a continuum between abject non-performance and complete performance. The

Operating Agreement's requirement of substantial performance also lies somewhere along the

continuum, and whether Kyle has met that threshold is the pertinent inquiry. When viewed in the

light most favorable to Kyle, the tasks that he did complete in furtherance of his obligations to

Apollomax would allow a reasonable jury to conclude that he had substantially performed.

Summary judgment on Count III is denied.

### D. Count IV – Breach of the Implied Covenant of Good Faith and Fair Dealing

Kyle's claim for breach of the implied covenant of good faith and fair dealing does not

pass muster. Applying the implied covenant is a "cautious enterprise" where the Court infers

contractual terms to span gaps in a contract that the moving party pleads were not anticipated by

either party. *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010); *Dunlap v. State Farm Fire

& Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (noting that "[e]xisting contract terms control . . .

such that [the implied covenant] cannot be used to circumvent the parties' bargain"). It follows

that "[g]eneral allegations of bad faith conduct are not sufficient. Rather, the plaintiff must

allege a specific implied contractual obligation and allege how the violation of that obligation

denied the plaintiff the fruits of the contract." *Kuroda*, 971 A.2d at 888. Arbitrary or

unreasonable conduct frustrating the "fruits of the bargain that the asserting party reasonably

expected" is a prerequisite for the Court to rely on the implied covenant. *Nemec*, 991 A.2d at

12

1126. Given this narrow purpose, it should come as no surprise that the implied covenant "is only rarely invoked successfully." *Kuroda*, 971 A.2d at 888.

Kyle's Amended Complaint asserts that the Defendants breached the implied covenant through their breaches of the Operating Agreement, which includes "the failure to negotiate in good faith the fair market value of Kyle's interests in Defendants." (D.I. 104, ¶ 78). As was the case with Count II, Kyle changed tactics in his brief, alleging instead that the breach of the implied covenant resulted from BTP's offer to be purchased by Apollomax and the formation of a new LLC that partnered with BTP. (D.I. 190 at 17). The operative theory appears to be that neither party could have anticipated that BTP would seek to be bought out by Apollomax or that Mr. O'Neill would form a new LLC to supply BTP's glove orders. (*Id.* at 18). Presumably Kyle believes that if the parties had envisioned either circumstance, they would have expressly forbidden such conduct in the Operating Agreement.

To the extent that Kyle's claim is based on a failure to negotiate the fair market value of Kyle's interests in Apollomax, that claim must fail because Section 7.4 of the Operating Agreement expressly covers the valuation of a removed member's interest. (D.I. 190-5, § 7.4f, g (stating that removed member shall receive "Removal Compensation Amount" in exchange for his LLC Units within one year of member's removal, and defining Removal Compensation Amount as "100% of the removed member's capital account")). The implied covenant cannot override the express contract language, and so it is inapplicable under the theory asserted in Kyle's Amended Complaint.

Kyle's newly fashioned theory that the implied covenant was breached by the attempted purchase of BTP or the formation of Apollo Marketing is similarly unavailing. Kyle's brief

13

recites only "general allegations of bad faith conduct" that are insufficient to support his claim:

> There is no way at the time the parties were negotiating the terms of the Operating Agreement they could have anticipated that their biggest customer would offer their fledgling LLC an opportunity to purchase that well-established entity. Certainly the parties could not have anticipated that Defendant O'Neill would form a new LLC and divert the business of Apollomax to that LLC to Apollomax's extreme detriment and included terms expressly proscribing this very conduct within the Operating Agreement.

(D.I. 190 at 18). Kyle has supplied neither a "specific implied contractual obligation" nor the subsequent breach of that obligation. Even assuming that Kyle has supplied both an obligation and a breach, he has failed to show how the implied covenant would prohibit Mr. O'Neill, the majority owner of Apollomax, from deciding to buy BTP or from entering into a new LLC venture. Under the Operating Agreement, Mr. O'Neill has the power to "pass or approve [a] motion, resolution, or otherwise take action" unilaterally because of his 85% ownership of the outstanding LLC Units.[7] (D.I. 190-5, § 3.5c). It is pure conjecture that Mr. O'Neill would have agreed to limit his rights as the majority owner of Apollomax by including express language in the Operating Agreement barring him from purchasing one of Apollomax's customers or from forming a new LLC, and this Court declines the invitation to rewrite the Operating Agreement in that manner. *See Nemec*, 991 A.2d at 1126 ("[W]e must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." (footnote omitted)). Moreover, Kyle does not clarify how BTP's February 2012 decision to purchase gloves from

---

[7] Section 3.5 of the Operating Agreement governs actions that may be taken by Apollomax members. (D.I. 190-5, § 3.5a-d). An affirmative vote in excess of 50% of the outstanding LLC Units is required to take action, and Mr. O'Neill's 850 LLC Units represent 85% of the 1,000 total LLC Units outstanding. (*Id.* §§ 3.1-.5).

Apollo Marketing (D.I. 190-15), or its March 2012 decision to dissolve its contract with

Apollomax (D.I. 190-14 at 4) breached an implied covenant that was owed to Kyle at the time of

contracting in June 2010. Accordingly, the Court will grant the Defendants' motion for summary

judgment as to Count IV.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment is granted

as to Counts II and IV, and the Defendants' motion for summary judgment is denied as to Counts

I and III. A separate Order, consistent with this Memorandum Opinion, will be entered.